**Luis E. Diaz PADILLA,
et al., Plaintiffs,**

v.

**TRIPLE–S, INC., Defendant.**

**Civil No. 07–1246 (DRD).**

United States District Court,
D. Puerto Rico.

July 30, 2007.

Pedro J. Landrau–Lopez, San Juan, PR, for Plaintiffs.

Cesar T. Alcover–Acosta, Manuel A. Pietrantoni, Casellas, Alcover & Burgos PSC, San Juan, PR, Roberto Cortes–Moreno, Roberto Cortes Moreno Law Office, Mayaguez, PR, for Defendant.

### ORDER AND OPINION

DOMINGUEZ, District Judge.

## I. PROCEDURAL HISTORY

The instant case is a breach of contract claim arising under the Employee Retire-

ment Security Act (ERISA), 29 U.S.C. § 1001, *et. seq.*, brought by Luis Diaz Padilla against Triple–S Inc. Plaintiff seeks injunctive and equitable relief, specific performance and damages for Defendant's refusal to cover Plaintiff's desired INTACS procedure under his ERISA-regulated insurance plan. Plaintiff is insured under a health benefit plan sponsored by his employer, COSTCO, and Triple–S is the health insurer of that group health plan. Plaintiff has a degenerative condition known as Keratoconus in both eyes for which his doctor recommends INTACS as a treatment alternative to corneal transplants. Defendant insurance company refused to cover this procedure under Plaintiff's health insurance plan because the Technology Evaluation Center (TEC) of the Blue Cross Blue Shield Association, the umbrella insurance organization under which Triple–S exists, deems this procedure "investigative". Plaintiff's health insurance plan does not cover "investigative" procedures. Plaintiff claims that this denial of coverage is unreasonable.

This case was removed from the San Juan Superior Court on March 23, 2007 (Docket No. 1) and the Court entertained a Show of Cause Hearing on May 7, 2007 (Docket No. 11). At this hearing, the Court granted Defendant ten (10) days to submit a motion for summary judgment.

On May 14, 2007, the Defendant filed its timely *Motion for Summary Judgment* (Docket No. 12) and corresponding *Statement of Uncontested Material Facts* (Docket No. 13). Therein, Defendant alleged that Plaintiff's claims are without merit under ERISA because Defendant's decision to deny coverage was reasonable. Defendant alleges that Plaintiff's case lacks merit because the TEC is one of the sources that the contract allows to exclude procedures from coverage for "investigative" or "experimental" status. Finally,

Defendant argues that the Puerto Rico Insurance Commissioner already confirmed Triple–S' denial of coverage, stating that the plan's exclusions were clear and unambiguous. Although the decision of the Insurance Commissioner is not binding on this Court, Defendant argues that the Court should give weight to the Commissioner's conclusions on the matter.

Plaintiff filed his *Opposition to Defendant's Motion for Summary Judgment* (Docket No. 14) on May 28, 2007 and a *Counter Statement of Uncontested Material Facts* (Docket No. 16) on June 4, 2007. Plaintiff's argument against summary judgment centers around his allegation that the medical reference manual from which Triple–S draws its definition of "investigative" (and therefore uncovered) procedures was not explicitly referenced in the policy. Plaintiff argues that the "TEC" which Defendant refers to in the policy is not the Technology Evaluation Center, but rather the Technology Evaluation Coverage Manual. Plaintiff also asserts that the Technology Evaluation Center itself does not promulgate strict regulations encouraging or discouraging any medical procedure. In addition, Plaintiff refers to the policy as an adhesion contract, which, in the case of any ambiguity, should be interpreted in favor of the policy holder.

Defendant reads Plaintiff's *Opposition* and *Counter Statement of Uncontested Facts* (Docket Nos. 14 and 16) as a camouflaged cross-motion for partial summary judgment. As such, Defendant opposes this cross-motion in its *Opposition to Plaintiffs' Request for Partial Summary Judgment* (Docket No. 20), dated June 7, 2007. Defendant states that, in the *Opposition* (Docket No. 14), the Plaintiffs present only conclusory and self-serving allegations, unsupported by any admissible evidence. Additionally, in its *Reply to Op-*

*position to Motion for Summary Judgment* (Docket No. 19), filed on June 6, 2007, Defendant presents three additional arguments in support of the essentiality of brevis disposition of the case. First, Defendant states that, by failing to contest Triple–S' uncontested material facts, Plaintiff allowed those facts to be admitted as a matter of law. Next, Defendant alleges that, regardless of whether the Court applies the *de novo* or arbitrary and capricious standard, the conclusion will be the same and hence the summary judgment is appropriate. Finally, Defendant asserts reliance upon the medical policy grounded in reliance upon the TEC's assessments.

Most recently, Plaintiff filed a *Surreply* (Docket No. 24) on June 18, 2007, renewing his claim that the policy is an adhesion contract to be interpreted in his favor as well as his protests regarding the meaning of the acronym "TEC" which is used in the policy. Additionally, Plaintiff challenges the use of the Technology Evaluation Center's assessments as they are not intended as recommendations for coverage.

After reviewing the individual facts of the case, the Court concludes that summary judgment for the Defendant is, in fact, warranted as a matter of law and that partial summary judgment for the Plaintiff is thus not appropriate. Accordingly, the Court **GRANTS** the Defendant's motion for summary judgment and therefore **DENIES** Plaintiff's motion for partial summary judgment for the reasons stated below.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) bestows upon the Court the power to grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). In order to overcome a motion for summary judgment, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Citing any alleged factual dispute between the parties is not sufficient; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). Under this standard, an issue is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Likewise, a fact is material where it has the "potential to affect the outcome of the suit." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993).

The nonmoving party may thus defeat a motion for summary judgment by showing that a trialworthy issue of material fact exists in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This action, however, "requires more than the frenzied brandishing of a cardboard sword." *Calvi v. Knox County*, 470 F.3d 422, 426 (1st Cir.2006). "Neither wishful thinking ... nor conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56 motion." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (internal citations omitted). Ultimately, "[o]nly if the record ... reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997).

■ There is, however, a critical distinction as to summary judgment disposition in ERISA cases. In these cases, the court acts in a distinctive manner and "sits more as an appellate tribunal than as a trial court." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir.2002). That is to say, "instead of considering affidavits submitted to the court, it evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Denmark v. Liberty Life Assur. Co. of Boston*, 481 F.3d 16, 26 (1st Cir.2007) (internal quotations omitted). In the instant case, the determination of lack of coverage is made by the company administrator, ultimately followed by a determination made by the Insurance Commissioner. Here, the Insurance Commissioner found a lack of coverage based on the following language from the policy itself:

This policy does not cover the following expenses or services:

1. . . .

10. Services that are not medically necessary, investigative or experimentally consolidated services, as defined in the Federal Drug Administration (FDA), Department of Human and Health Services (DHHS), the Department of Health, or services that are not in agreement with the medical policy established by the Technology Evaluation Coverage Manual (TEC) of the Blue Cross and Blue Shield Association for the indications and specific methods ordered.

Because the court's review is generally based on the administrative record, "summary judgment is simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir.2005). Therefore, "the non-moving party is not entitled to the usual inferences in its favor." *Id.*

## III. BREACH OF CONTRACT CLAIM UNDER ERISA

■ Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA) provides litigants with a cause of action for recovery of wrongfully denied insurance benefits. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 205, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). In this capacity, section 502(a)(1)(B) provides that a "civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). When Congress enacted this legislation, it intended that ERISA's civil enforcement scheme be exclusive and that all cases "asserting improper processing of claims under ERISA-regulated plans be treated as federal questions." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Along the same lines, Congress intended for ERISA to provide uniform regulation for employee benefit plans and preempt similar state claims in an effort to "ensure that employee benefit plan regulation would be exclusively a federal concern." *Davila*, 542 U.S. at 208, 124 S.Ct. 2488 (internal quotations omitted).

■ The method of the statute is clear: "the benefit provisions of an ERISA-regulated . . . insurance policy [are] interpreted under principles of federal substantive law." *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir. 1989). Therefore, from inception onwards, there has existed an unequivocal understanding that ERISA would be governed by a "federal common law of rights and obligations" rather than state law. *Pilot*, 481 U.S. at 55, 107 S.Ct. 1549. Actually, the "expectation that a federal common

law ... under ERISA ... would develop ... make[s] little sense if the remedies available to ERISA participants and beneficiaries ... could be supplemented or supplanted by varying state laws." *Dedeaux*, 481 U.S. at 56, 107 S.Ct. 1549. Thus, ERISA's comprehensive civil enforcement scheme is intended to preempt entirely the possibility of obtaining remedies for the same damage under state law. *Davila*, 542 U.S. at 208–9, 124 S.Ct. 2488.

■ Nearly two decades ago, the Court of Appeals for the First Circuit presented the framework for interpretation of claims under ERISA, stating that a court's decisions "must embody common-sense canons of contract interpretation." *Burnham*, 873 F.2d at 489. Thus, the mandate in the First Circuit is that "courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." *Id.* Consequently, where the words of an ERISA-governed insurance contract are "clear, precise, and definite," this Court will not construe it in any manner other than its "ordinary and usual sense." *Id.* (internal citations and quotations omitted).

■ Paramount in ERISA claims is the precept that, where the language of an insurance policy clearly denotes the underlying objectives for coverage, the Court will "refrain from conjuring up ambiguities" and must avoid "mental gymnastics which give the terms of the policy a forced or distorted construction." *Burnham*, 873 F.2d at 490–1(internal citations omitted). The inclusion of an insurance plan under the protection of ERISA regulation does *not* diminish the applicability of this basic rule of contract interpretation. *Id.* at 491. The Court accordingly does not have the power to redraft insurance contracts in order to "palliate the effects of considered language on the occasional hard case." *Id.*

Judicial review of an ERISA case arising under § 1132(a)(1)(B) follows one of two standards. Where the plan itself "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the 'plan,' then the court must apply the deferential 'arbitrary and capricious' standard of review." *Eusebio Cotto Villegas v. Federal Express Corp.*, 468 F.Supp.2d 293, 306–7 (D.P.R.2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Thus, where upon reading the plan it becomes clear that the plan designates discretionary authority to determine benefit eligibility to the administrator, the arbitrary and capricious standard is applied. *Id.* at 307. Where such designation is not immediately apparent, however, the correct standard of review is *de novo*. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948.

## IV. ANALYSIS

■ In the instant case, despite the Defendant's contentions to the contrary, the Court finds no explicit designation of discretionary authority to an administrator or fiduciary immediately apparent within the body of the plan. *See Denmark* 481 F.3d at 26 (finding such authority delegated where the policy provided that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and determine benefit eligibility hereunder.") Therefore, the arbitrary and capricious standard shall not be applied here to determine whether the denial of benefits was proper. Rather, the breach of contract claim will be reviewed by the Court *de novo*. Although the Court chooses to review Plaintiff's breach of contract claim *de novo*, the Court notes that this standard is the less favorable of the two to Defendant, and that the Court's ultimate decision would thus not

change under the arbitrary and capricious standard. *See Orndorf,* 404 F.3d at 518 n. 10.

■ The Court will bypass the parties' quibbling over the admission of exhibits and filing of uncontested facts to address the substance of the argument. In its *Motion for Summary Judgment* (Docket No. 12), the Defendant clearly asserts that, under the uncontested facts as it views them, there is no genuine issue of material fact which would require this claim to handled by a jury. In the instant case, as in most ERISA cases, "the validity of [the] claim ... turn[s] on the interpretation of the terms in the plan at issue." *See Orndorf,* 404 F.3d at 517. In this motion, Defendant makes it clear that the Plaintiff's case is without merit because there was no wrongful denial of funding for the INTACS procedure under the plain terms of the contract, which excludes such "investigative" and/or "experimental" procedures. After Defendant thus showed that there is no genuine issue of material fact, the burden shifted to the Plaintiff to show that a trialworthy issue of material fact still exists in the case. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. It is at this junction where the Court's analysis begins.

Although Plaintiff's argument that his insurance plan is in fact an adhesion contract and must therefore be construed in his favor might arguably carry some weight in state court, this argument clearly fails to pass muster here where it flies in the face of the body of federal common law which has developed regarding ERISA claims. Thus, the Plaintiff has only presented one legally plausible argument upon which he rests the entirety of his burden, attempting to hang on to his case by a fingernail. The fingernail from which Plaintiff hangs is the apparent ambiguity within the plan where it names the source which defines "investigative" and "experi-

mental" procedures for the purpose of determining plan coverage. The source which the plan names is the "medical policy established by the Technology Evaluation Coverage Manual (TEC) of the Blue Cross Blue Shield Association." Exhibit B of Docket 12 at 4.

Although the Court may sympathize with Plaintiff's confusion regarding the dual usage of the TEC acronym, the Court must still find that no genuine issue of material fact exists which a reasonable jury could decide in favor of the Plaintiff. Plaintiff truly comes closer to creating a proverbial "tempest in a teapot" than to proving the existence of a trialworthy issue of material fact which would satisfy his burden. In Plaintiff's policy, Defendant insurance company clearly states that certain procedures which are deemed "experimental" or "investigative" will not be covered. Although the policy does not specifically names the Technology Evaluation Center as one of the bodies which determines the "experimental" or "investigative" status of procedures, it does cite the Blue Cross Blue Shield's "TEC" (Technology Evaluation Coverage Manual) as a definitive source of the policy which Triple–S follows in determining this status. This Court has not seen any evidence of the existence of such a manual. In fact, even if there were such a manual, its acronym would be TECM rather than TEC, the acronym cited within the policy. Accordingly and in reliance upon the uncontested facts in accordance with Local Rule of Civil Procedure 56(e), it is pellucid to the Court that the only TEC currently in existence within the Blue Cross Blue Shield Association is the Technology Evaluation Center. The Technology Evaluation Center is a research organization which, like Triple–S, falls under the umbrella of the Blue Cross Blue Shield organization. Neither the TEC nor Triple–

S control Blue Cross Blue Shield nor each other. Rather, Triple–S is a constituent insurance company that independently chose to follow the determinations of the TEC, an organization completely independent from Triple–S. The TEC is an organization comprised of nineteen (19) members chosen from appointees from independent special societies whose mission is to develop criteria for assessing the nature of medical procedures. These criteria are presented to the Blue Cross Blue Shield in the form of assessments which are not binding upon Blue Cross Blue Shield. Member insurance companies may then cite to these assessments as they chose to determine what coverage they will provide to their policyholders.

The Court must not lose sight of what Plaintiff claims is the genuine issue of material fact worthy of jury trial here and the sole issue to be discussed. This issue concerns the use of one source rather than another for the definition of what constitutes an "experimental" or "investigative" procedure and is therefore not covered under the insurance policy. It does not appear, however, that defendant insurance company is nickle-and-diming a policy holder here, especially as it will pay for a more expensive treatment in the form of corneal transplants. Rather, the insurance company presumably acted here in a manner motivated primarily by concern for the patient, whose longterm prognosis after the INTACS procedure is still unknown, when they chose to follow the TEC's assessments. These assessments are created by an independent organization over which Triple–S has no control and whose recommendation for "investigative" classification is also adopted by the Blue Cross Blue Shield umbrella organization in its own Medical Policy Reference Manual. In fact, in this manual, Blue Cross Blue Shield states that the scientific data regarding the use of INTACS as a treatment for Keratoconus is inadequate to permit scientific conclusions. Thus, the citation of a treatment's classification, established by another independent prong (the TEC) of the same umbrella organization (Blue Cross Blue Shield), is clearly adopted by that overarching organization in their own Medical Policy Reference Manual.

Where the only ambiguity is the use of an identical acronym for both a non-existent manual and the body which creates the assessments of what constitutes an "investigative" or "experimental" procedure, the Court finds no genuine issue of material fact which deserves a jury trial. Whether the citation to the Technology Evaluation Coverage Manual in the policy was a misstatement or not, it is clear from both the Blue Cross Blue Shield Association's own adoption of the TEC's findings and the use of the TEC acronym in the policy itself, that Triple–S definitively chose to follow the TEC's assessments regarding classification of treatments as either "investigative" or "experimental". The Court may not alter the meaning of the contract as both parties should have understood it at the time of formation by inferring a different solution based solely upon the misstatement of an acronym's root words, especially where the insurance company's benign intent is also clearly expressed in the umbrella organization's own policy manual. Although the interchangeable use of the TEC acronym for both the Technology Evaluation Center (TEC) and the mythical Technology Evaluation Coverage Manual renders the policy less "clear, precise and definite" than the Court would ideally wish, the Court does not have the power to "redraft insurance contracts to palliate the effects of considered language on the occasional hard case." *See Burnham* 873 F.2d at 491. In fact, given the evidence on the record, constru-

ing the terms of the policy in the instant case as intending to cite anything other than the Technology Evaluation Center (TEC) as the authoritative word on "investigative" procedures would be to perform the type of "mental gymnastics" against which *Burnham* warned. *See* 873 F.2d at 491.

## V. CONCLUSION

Ultimately, Plaintiff's weak arguments have fallen short of convincing the Court that a reasonable jury might find for him based on the fact which he claims is material and in controversy. This is especially true because the plaintiff in an ERISA claim is not entitled to the usual inferences in his favor to defeat a motion for summary judgment. The Court understands through an overall reading of the policy that the policy calls the Technology Evaluation Center (TEC) a source for what is "investigative" for purposes of insurance coverage; the Court believes that this inference is valid and written with the well-being of the insured in mind. This solution should have been reasonably clear to Plaintiff, both through the company's expected inference, demonstrated in its use of the TEC acronym, and through the use of the Technology Evaluation Center's assessments in the Blue Cross Blue Shield Association's policy manual. Therefore, Plaintiff has not met the burden of proving the existence of a genuine issue of material fact upon which a jury could decide in his favor. Therefore, for the reasons stated above, the Court **GRANTS** Defendant's *Motion for Summary Judgment* (Docket No.12). Accordingly, if, in fact, Defendant was correct and Plaintiff's *Opposition* (Docket No. 14) was a disguised motion for partial summary judgment, that motion is **DENIED.**

Judgment of dismissal is to be ordered.

IT IS SO ORDERED.